UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

ANGELA GONZALES, an individual,
LINDA BOYD, an individual and
BRANDEE COLOMBO, an individual,,

                      Plaintiff,

v.

ORGANOGENESIS, INC., a Delaware
Corporation; and DOES 1-50, inclusive,,

                      Defendant.

Case No.:  15cv1530-CAB-NLS

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

[Doc. No. 28]

     This matter is before the Court on the motion for summary judgment filed by Defendant Organogenesis, Inc. ("OI").  The motion has been fully briefed and the Court deems it suitable for submission without oral argument.  There are three plaintiffs in this action, each of whom asserts her own claims against OI.  Although the parties frame their arguments as if the three plaintiffs' claims should succeed or fail as one, the reality is that each plaintiff's claims here are premised on distinct facts with little overlap.  Whether one plaintiff can or cannot survive summary judgment does not mandate an identical result for the other plaintiffs.  None of the plaintiffs were present at the same time for any of the purportedly harassing or discriminatory conduct that forms the basis of their claims, and each plaintiff was terminated at different times and under different circumstances.  Thus,

each plaintiff and each claim must survive summary judgment on its own. Accordingly, each claim must be analyzed separately for each plaintiff.

The Court therefore treats this motion as the equivalent of three separate motions for summary judgment, one against each plaintiff. Despite analyzing each claim for each plaintiff separately, the result is ultimately the same. The motion is granted in its entirety with respect to each of the three Plaintiffs' five claims.

## I. Background[1]

### A. Facts Common to All Three Plaintiffs' Claims

Plaintiffs Angela Gonzales, Linda Boyd, and Brandee Colombo each worked for OI as Tissue Regeneration Specialists ("TRS"). A TRS's primary responsibility is to sell an OI product called "Apligraf" to medical providers and to educate them on how to use it. [Doc. No. 28-2 at 9-10.][2] Each Plaintiff was responsible for a different territory in southern California.

In February 2013, OI hired Oscar Ferrer as the Regional Sales Manager ("RSM") for OI's southwest region, which included all three Plaintiffs' territories. [*Id.* at 450-52; Doc. 31-5 at 2.] From that point forward, Plaintiffs reported to Ferrer, and Ferrer reported to Stanley Austin, who was OI's Director of Commercial Operations Western ("DCO"). [Doc. No. 28-2 at 12, 455.] Ferrer's responsibilities as RSM included supervising TRSs and accompanying them on visits to medical professionals, referred to as "ride-alongs". [*Id.* at 456-58.] According to Plaintiffs, they rarely saw Ferrer, but each Plaintiff states that on the few occasions she was in his presence, typically during ride-alongs, Ferrer made unwelcome or inappropriate comments. [Doc. Nos. 28-2 at 117; 31-7 at 44.] However, at no point was more than one of the Plaintiffs present for any of Ferrer's alleged inappropriate comments. In August 2013, Gonzales filed a formal written complaint with

---

[1] The parties have each made various objections to the opposing parties' evidence. [Doc. Nos. 31-4, 33.] Because none of these objections concern any evidence the exclusion of which would result in a different outcome of the instant motion, both parties objections are denied as moot.

[2] Pinpoint page citations to documents in the record are to the ECF page number at the top of the page.

OI about Ferrer, and Boyd and Colombo reported their experiences with Ferrer to OI's human resources manager over the phone following Gonzales's complaint. OI reprimanded Ferrer, and he apologized to Plaintiffs, in September 2013. After his apology, Ferrer did not make any more discriminatory or harassing comments to any of the Plaintiffs. In December 2013, OI terminated the employment of all three Plaintiffs.

On July 10, 2015, Plaintiffs filed this lawsuit. The complaint asserts five claims against OI: (1) gender discrimination in violation of California Government Code section 12940(a); (2) sexual harassment in violation of California Government Code section 12940(j)(1); (3) wrongful termination in violation of public policy; (4) retaliation in violation of California Government Code section 12940(h); and (5) failure to prevent discrimination in violation of California Government Code section 12940(k).

### B.    Evidence Related to Angela Gonzales's Claims

Angela Gonzales began working for OI as a TRS in April 2005. Although the borders of the territory for which she was responsible changed over time, at some point she became responsible for the San Diego territory, and when the San Diego territory was divided, Gonzales was assigned the "San Diego West" territory. [*Id.* at 11.] As mentioned above, Ferrer became Gonzales' supervisor in February 2013. According to Gonzales, the only times she saw Ferrer during her employment were when he accompanied her on ride-alongs on April 15, August 9, and October 17, 2013. [Doc. No. 31-7 at 44.] Gonzales acknowledged in her deposition that during her employment with OI, Ferrer is the only person that made any statements that she found to be harassing or discriminatory on the basis of sex or gender. [Doc. No. 28-2 at 81.]

On August 9, 2013, Gonzales emailed Phyllis Howard, an OI human resources manager, asking to have a conference call. [*Id.* at 116.] On August 12, 2013, Gonzales spoke with Howard to complain about things Ferrer had said to her and how he had treated her on the April 15 and August 9 ride-alongs. [*Id.* at 64-66.] Gonzales also explained that she had had some problems with Ferrer five years earlier, when Ferrer worked for another company and covered the same territory as Gonzales. [Doc. No. 31-10 at 28.] Howard

told Gonzales to put her complaints in writing so that Howard could follow up on them. [Doc. No. 31-9 at 3-4; 31-10 at 28.]

Later on August 12, 2013, Howard emailed Houda Samaha, OI's human resources director, describing her conversation with Gonzales. [Doc. No. 31-10 at 28.] Among other things, Howard's email stated: "I asked what she would like to have happen—she didn't know. . . just wanted to get this out—doesn't ever want to be alone with him—would prefer to not have him as her manager." [*Id.*] On August 14, 2013, Samaha emailed Austin and Howard suggesting that they discuss what other information they needed to know concerning Gonzales's complaints about Ferrer. [Doc. No. 31-10.]

Also on August 14, 2013, Ferrer emailed Gonzales to put her on 60-day Objective Setting Plan. [Doc. No. 28-2 at 121.] The document outlining the plan was attached to the email and dated August 9, 2013. [*Id.* at 122] It noted that Gonzales's territory had "significantly missed goals the last 7 months," and that for the year 2013, Gonzales was ranked 110 out of 159 TRS's. [*Id.* at 122-23.] The document concluded: "Your goal is to achieve or exceed 100% of quota each month, along with showing consistent volume growth in your key accounts and the territory. ***You need to create and sustain the performance necessary to meet the company's sales goals for your territory. If these goals are not achieved, further actions may be necessary, including a more formal plan or termination.***" [*Id.* at 124 (***emphasis*** in original).]

The following day, on August 15, 2013, Gonzales submitted a written complaint to OI's department of human resources about Ferrer. [*Id.* at 117.] Among other things, the complaint alleged that:

- Ferrer "has created a hostile environment," and "has been completely inappropriate and unprofessional and has now created a situation where I am not comfortable with him as my manager nor do I feel comfortable being alone with him." [*Id.*]

- On the April 15, 2013, ride-along, Ferrer "belittled" Gonzales, discussed "the lack of respect [she] had within the company," told her that she was

4

considered the "black sheep" and that Austin did not respect her or like her. [*Id.*] Ferrer also told Gonzales not to call human resources. [*Id.*] Later in the day, Ferrer "shared personal details of other sales reps . . . as well as his own personal opinion of . . . Linda Boyd . . . and Brandee [Colombo],"[3] and that Boyd and Colombo had "been put on performance improvement plans (PIP) in hopes to 'clean house.'" [*Id.*] Ferrer also "mentioned his need to fire someone before they became pregnant." [*Id.*]

- On August 8, 2013, Ferrer sent Gonzales a text message "expressing not liking to make women cry, along with a smiley face emoticon." [*Id.* at 119.]
- On the August 9, 2013, ride along Ferrer talked about Colombo giving away baby clothes, asked Gonzales "why don't you have a baby? Are you sure you don't want one?", referred to Gonzales as "girl," and accused Gonzales of lying about a prior FMLA request to take time off to care for her father. [*Id.* at 119.] Ferrer stated that Austin believed that Gonzales was lying as well. [*Id.*]

Howard forwarded Gonzales's written complaint to Austin and Samaha [Doc. No. 31-10 at 31] and suggested that they discuss it later that day. On August 16, 2013, Howard conducted a telephone interview with Gonzales about her written complaint. [Doc. No. 31-9 at 60.] Howard's notes from that interview indicate that Gonzales repeated and elaborated on many of the allegations in her complaint and also described comments that Ferrer had made about being able to distinguish women's buttocks based on whether they are black, white or Mexican, including the statement: "girl, I can tell a black woman's ass from a white woman's ass to a Mexican woman's ass." [*Id.* at 64.] The notes conclude: "I [Howard] asked Angela what things would you like to have different going forward and

---

[3] The letter actually refers to "Brandee Bowen." Although the parties never explain as much in their briefs, the Court has discerned from the record that Brandee Bowen is Plaintiff Brandee Colombo. [Doc. No. 28-2 at 431.]

she responded that Oscar was rude—unprofessional—didn't help to build her confidence, didn't treat her professionally. 'I told him – don't attack me as a person. If my sales tactics are a problem then tell me – don't call me a liar.'" [*Id.* at 65.] Howard testified that she interviewed Austin [Doc. No. 31-9 at 29-35], Ferrer [Doc. Nos. 31-9 at 8-13; 31-10 at 16-18], and every other TRS in the territory supervised by Ferrer [Doc. No. 31-9 at 7] as part of her investigation of Gonzales's complaint.

On September 10, 2013, Austin sent Ferrer a letter with the subject line: "Manager Communication with Employees." [Doc. No. 31-10.] The letter references complaints made against Ferrer by "multiple employees," including his use of "girl" to refer to female TRS's, questioning female employees about pregnancies, and discussing the status of other employees' performance management measures. [*Id.*] The letter stated that "such communications are not acceptable behavior for a management employee," and instructed him to stop such communications immediately. [*Id.*] The letter stated that OI would expect him to attend a seminar or class concerning "appropriate communications for managers." [*Id.*] Ferrer never attended such a seminar or class. [Doc. No. 31-12 at 12.] However, after the investigation, Ferrer was required to, and did, formally apologize to Gonzales individually on a call with Austin, Samaha, and Howard on the line. [Doc. No. 28-2 at 76, 435.] Ferrer also apologized on a separate call to everyone on his sales team, including Colombo and Boyd. [*Id.* at 14, 76-77, 243.]

Following these apologies, Ferrer went on another ride-along with Gonzales on October 17, 2013. During that ride-along, Ferrer, in reference to a third person who had been wearing a giant sun hat, said, "Did you see that rep with that hat? What is it? Cinco de Mayo?" and then immediately apologized for the comment. [*Id.* at 78-79.] Aside from this comment, Ferrer did not say anything else that Gonzales thought was harassing or inappropriate during this ride-along. [*Id.*]

On November 22, 2013, Samaha and Patrick Bilbo, OI's vice president, regulatory, government affairs, and compliance, sent Gonzales a letter with the subject line: Warning Letter—Compliance Policy Violations. [*Id.* at 418-423.] The letter identified compliance

issues that Ferrer had observed on his October 17, 2013 ride-along and that Boniface Emmanuel, who was a member of OI's compliance department, had observed on an October 31, 2013 ride-along. [*Id.*] The letter concluded that "based on the issues observed by [Ferrer] and [Emmanuel], it has been determined that you need to complete remedial Compliance training to ensure that you clearly understand the Company's Compliance policies governing its field Sales Force. . . . This training must be completed by December 31, 2013." [*Id.* at 422.]

On November 25, 2013, Gonzales participated in a teleconference with Samaha, Austin, Emmanuel, Bilbo, and Paige Sweeney, who was another member of OI's compliance department, to discuss the November 22 letter. [*Id.* at 31-34.] During the teleconference, Emmanuel went over each of the compliance violations outlined in the letter. [*Id.* at 35.] On the call, Gonzales provided an explanation for each of the violations, generally disputing that any of her actions violated compliance policies. [*Id.* at 35-46.] She was defensive and raised her voice. [*Id.* at 36.] On December 5, 2013, Gonzales signed an acknowledgment of the warning letter but included the following handwritten note: "I am signing the document as an acknowledgment that I have read and received it. I, however, disagree with the content, the accusations, and the untruths that make up the content of the warning letter. I contest the information and discussion of the total contents of the letter." [*Id.* at 423.]

On December 16, 2013, OI terminated Gonzales. The letter informing her of her termination was signed by Austin and explained that the decision was based on repeated compliance infractions, including those identified in the November 22, 2013 letter, as well as an audit of her October 2013 expense reports that found additional infractions. The letter concluded: "Given the fact that you termed the infractions listed on the Warning Letter as 'untruths,' and also given that these further infractions were found in your Expense Reports, it has been determined that you are unable to comply with [OI's] rigorous Compliance Program. The decision was recommended by [OI's] outside compliance counsel, outside employment counsel and was accepted by the Compliance Committee of

7

Organogenesis." [*Id.* at 115.] At her deposition, Gonzales testified that she did not have any indication that OI was firing her for a reason not stated in the letter or that the statement concerning who made the decision to terminate her was inaccurate. [*Id.* at 57-58.] Meanwhile, Austin testified that he, Bilbo, and Samaha participated in the decision to terminate Gonzales, but that Bilbo and Samaha were the primary decision-makers. [Doc. No. 31-11 at 72.]

Based on this evidence, Gonzales argues that the Court should deny OI's motion for summary judgment on each of the five claims asserted in the complaint.

## C. Evidence Related to Linda Boyd's Claims

Linda Boyd began working for OI as a TRS in January 2007. [Doc. No. 28-2 at 129.] Her territory was located in the Los Angeles area and was part of the region supervised by Ferrer. During the period when Ferrer was her supervisor, Boyd was in his presence no more than eight times, which included four or five ride-alongs and two or three sales meetings with other TRSs. [Doc. No. 31-2 at 2.] Boyd identifies four comments by Ferrer during these meetings to support her discrimination and harassment claims:

- In May 2013, Ferrer commented on a presentation Boyd made to some medical professionals, telling her, "I really think that you should keep your presentations simple." When Boyd asked what he meant, Ferrer elaborated, "You know, you should present to your group, something you're comfortable with, like baking a cake. You know, tell people if you don't have all the ingredients in your recipe, then you can't bake a cake." [Doc. No. 31-7 at 67-69.]

- During the same conversation in May 2013, Ferrer also commented on Boyd's use of the pronoun "we" to describe OI during the presentation, telling Boyd, "It sounds too motherly. It sounds too nurturing. . . That's unprofessional. You should use the company's name 'Organogenesis.'" [Doc. No. 28-2 at 162-64.]

- In June 2013, during a ride-along with Boyd, Ferrer was talking about a receptionist at a hospital they had visited and when Boyd asked him which receptionist, Ferrer responded, "She sits behind a desk. She's a withered, old lady, in her late 50s, very cranky, menopausal. You know, she's a tough one; right?" [Doc. No. 31-7 at 66.]

- In August 2013, during a ride-along with Boyd, Ferrer commented that he had gone out to dinner with another sales representative and some nurses of a client or potential client and that one of the nurses seemed interested in him. Ferrer then said, "I think I should take one for the team," which Boyd believed was meant to imply that he would consider sleeping with the nurse to get business. [Doc. No. 28-2 at 158-59.]

On June 4, 2013, OI placed Boyd on an Objective Setting Plan. The letter from Ferrer informing Boyd of the plan stated that Boyd's territory had significantly missed its sales goals over the previous nine months and that she was ranked 168 out of 170 among TRSs for the fourth quarter of 2012. [Doc. No. 31-7 at 85.] The letter stated that the plan was to be in place for 60 days and could be lengthened or shortened based on Boyd's progress. [*Id.* at 87.]

In August 2013, Howard called Boyd in connection with the investigation of Gonzales's complaint. [Doc. No. 28-2 at 166-67.] Boyd testified that she mentioned the "cake" comment and the "motherly" comment listed above to Howard on that call. [*Id.* at 160] She was not certain or did not recall whether she told Howard about the other two comments listed above. [*Id.* at 163-65.] Aside from this one telephone conversation with Howard, Boyd did not discuss Ferrer's comments with anyone else in human resources or upper management at OI. [*Id.* at 165.]

In September 2013, Ferrer hired a new male TRS and gave him two of Boyd's accounts. [Doc. No. 31-7 at 77-78.] With the opposition brief, Boyd submitted a declaration stating that Ferrer told her that he transferred these accounts to the male TRS

"would better serve the 'old boy' network in these accounts."[4]  [Doc. No. 31-2 at 2-3.]  On October 14, 2013, OI placed Boyd on a Performance Improvement Plan ("PIP").  The letter from Ferrer informing Boyd of the plan stated that she had achieved her sales goals in only three of the first eight months of 2013, and that she had only achieved 49% of her goal in September 2013.  [Doc. No. 31-7 at 89.]  For the first eight months of the year, Boyd was ranked 145 out of 155 TRSs.  [*Id.*]  The letter stated that the plan was to be in place for 60 days effective October 1, 2013, but that it could be extended.  [*Id.* at 91.]

On December 10, 2013, Boyd, Colombo, and Joe Wilson,[5] a male TRS in the southwest region under Ferrer's supervision, were terminated as part of a lay-off of 2-3 TRSs in each region.  [Doc. No. 28-2 at 276.]  Two recently hired male TRSs in Ferrer's region were not laid off.  The lay-offs stemmed from a November 2, 2013 ruling that resulted in a significant reduction in the Medicare reimbursement rate for Apligraf that was to take effect on January 1, 2014.  [*Id.* at 261-62.]  Every department at OI had to lay off employees as a result of this change.  [*Id.* at 263.]  The four OI employees who determined which individuals would be laid off were Richard Shaw, Michael Rothstein, Brian Grow, and Stanley Austin.  [*Id.* at 260.]  Ferrer testified at his deposition that he did not participate in the decision to layoff Boyd and Colombo, and that he did not speak with anyone at OI about the factors used in making the layoff decisions.  [*Id.* at 473-74.]

### D.  Brandee Colombo's Claims

Brandee Colombo began working for OI as a TRS in May 2011.  [Doc. No. 28-2 at 202-03.]  She was responsible for the Palm Springs territory, which was part of the

---

[4] OI objects to this evidence because Boyd never mentioned this statement during her deposition and when asked if there were "any other comments that [Ferrer] made during the time that you were both employed with [OI] that you found to be discriminatory based on gender or age, or any other reasons," Boyd responded "Not that I can recall.  No."  [Doc. No. 28-2 at 166.]    OI's objection is warranted in that Boyd is attempting to introduce new evidence after the close of the discovery period.  However, assuming the truth of Boyd's statement about Ferrer's "old boy" comment does not change the Court's analysis with respect to any of Boyd's claims.  Accordingly, OI's objection is overruled.

[5] Wilson was later rehired by OI as a TRS for the Las Vegas territory.  [Doc. No. 31-12 at 15-17.]

southwest region supervised by Ferrer. [*Id.* at 203-04.] During the period when Ferrer was her supervisor, Ferrer went on ride-alongs with Colombo approximately once per month. [Doc. No. 31-2 at 2.] Colombo identifies four comments by Ferrer during these ride-alongs to support her discrimination and harassment claims:

- During her first ride-along with Ferrer in March 2013, while they were engaging in small talk about their families, Ferrer asked Colombo, "are you planning on having more children? Are you going to get pregnant?" [Doc. No. 28-2 at 239.] Colombo responded Ferrer, "Oh, well, that's an option. Like I'm considering." [*Id.*] Colombo testified that she "didn't really think anything of [Ferrer's question] at the time." [*Id.*]

- During their next ride-along in April 2013, Ferrer asked Colombo, "Are you pregnant yet? Do you have a timeline?" [*Id.* at 240.]

- During a ride-along in May 2013, Ferrer asked Colombo, "Are you still planning on having a baby? Are you still planning to get pregnant?" [*Id.* at 241.]

- In August 2013, after observing a conversation between Colombo and a medical assistant about the assistant's grandson during which Colombo mentioned that she had a lot of excess baby clothes, Ferrer asked Colombo, "why would you give away your baby clothes? Like, aren't you planning on having another child? That just doesn't make sense to me." [*Id.* at 231.] After Colombo responded that she did not intend her statement to the assistant to be an offer of a gift, Ferrer responded, "Yeah, it's a fine line, you know, to walk. It depends how you do it. I still don't get like why you would be giving away your clothes if you still want to have more babies." [*Id.*]

On June 3, 2013, OI placed Colombo on an Objective Setting Plan. The letter from Ferrer informing Colombo of the plan stated that Colombo's territory had missed its sales goals seven of the previous twelve months and was ranked 73 out of 170 among TRSs for the year 2012, and 155 of 159 for the first three months of 2013. [Doc. No. 31-8 at 21-22.]

11

The letter stated that the plan was to be in place for 60 days and could be lengthened or shortened based on Boyd's progress.  [*Id.* at 23.]

On August 2, 2013, OI placed Colombo on a PIP.  The letter from Ferrer informing Colombo of the plan stated that she had continued to miss sales goals in 2013, and that through May 2013, Colombo was ranked 144 out of 159 TRSs.  [Doc. No. 28-2 at 251.] The letter stated that the plan was to be in place for 60 days effective August 1, 2013, but that it could be extended.  [*Id.* at 253.]  On October 14, 2013, Ferrer sent Colombo a letter stating that she had "successfully reached the goals outlined" in her PIP.  [*Id.* at 255.]

In mid to late August 2013, Colombo called Howard because she "wanted some clarification regarding the parameters of the PIP and to hear . . . her side of it." [Doc. No. 31-8 at 12-13.]  During this conversation with Howard, Colombo also discussed Ferrer's comments and that she "felt [she] was being discriminated against. . . . And that . . . [she] was in fear of retaliation from [Ferrer] as well.  And that was one of the reasons with the PIP. . . ." [*Id.* at 13.]  Aside from this one telephone conversation with Howard, Colombo did not discuss Ferrer's comments with anyone else in human resources or upper management at OI.  [Doc. No. 31-8 at 18.]

According to Colombo, after Ferrer apologized to the TRSs following Gonzales's complaint, Ferrer asked Colombo if he had said anything or done anything to make her feel uncomfortable.  [Doc. No. 31-8 at 9.]  Colombo also felt that after the apology, "there was a different vibe" working with Ferrer, that his tone "was kind of condescending in a sense," and that he "was a little bit more guarded with [Colombo] than he had been before."  [*Id.* at 9-10.]

As discussed above, on December 10, 2013, OI terminated Colombo as part of a lay-off of employees following the November 2013 ruling that would result in lower Medicare reimbursements for Apligraf.

## II.    Legal Standards

### A.    Summary Judgment Standard

The familiar summary judgment standard applies here.   A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  To avoid summary judgment, disputes must be both 1) material, meaning concerning facts that are relevant and necessary and that might affect the outcome of the action under governing law, and 2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (citing *Anderson*, 477 U.S. at 248).

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *See Celotex Corp.*, 477 U.S. at 322-323.  If the moving party can demonstrate that its opponent has not made a sufficient showing on an essential element of his case, the burden shifts to the opposing party to set forth facts showing that a genuine issue of disputed fact remains.  *Id.* at 324.  When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  However, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

### B.    *McDonnell Douglas* Burden Shifting Framework

The complaint asserts one common law claim and four claims under California's Fair Employment and Housing Act ("FEHA").  "California applies the *McDonnell Douglas* burden-shifting framework and other federal employment law principles when interpreting

the FEHA." *Schechner v. KPIX-TV*, 686 F.3d 1018, 1023 (9th Cir. 2012); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  As the Ninth Circuit has explained:

> The *McDonnell Douglas* analysis imposes on the plaintiff an initial burden of establishing a prima facie case of discrimination.  To establish a prima facie case, a plaintiff must offer evidence that gives rise to an inference of unlawful discrimination.  The prima facie case may be based either on a presumption arising from the factors such as those set forth in *McDonnell Douglas*, or by more direct evidence of discriminatory intent.  The requisite degree of proof necessary to establish a prima facie case for Title VII on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.

*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998) (internal quotation marks, brackets, ellipses and citations omitted).[6]  "While the plaintiff's prima facie burden is not onerous, [s]he must at least show actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a prohibited discriminatory criterion."  *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 355 (2000) (internal quotation marks and citations omitted).  "Once a prima facie case is shown, a presumption of discrimination arises and the burden shifts to the defendant to show that the adverse employment action was taken for a legitimate, nondiscriminatory reason."  *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1242 (9th Cir. 2013).  If the employer satisfies this burden, "the presumption of discrimination disappears" and the burden shifts back to the plaintiff to prove that the reason offered by the employer is a pretext for a discriminatory or retaliatory motive.  *Guz*, 24 Cal. 4th at 356.

---

[6] The Ninth Circuit has held that sexual discrimination claims are assessed similarly under either Title VII or FEHA because "Title VII and FEHA operate under the same guiding principles."  *Brooks v. City of San Mateo*, 229 F. 3d 917, 923 (9th Cir. 2000); *see also Godwin*, 150 F.3d at 1219 ("Because California law under the FEHA mirrors federal law under Title VII, federal cases are instructive."); *Keifer v. Hamilton Engine Sales, Inc.*, No. CIVS042077LKKDAD, 2006 WL 2620926, at *5 (E.D. Cal. Sept. 13, 2006) ("Lawsuits claiming retaliatory employment termination in violation of FEHA are analogous to federal Title VII claims, and are evaluated under federal law interpreting Title VII cases.").

In evaluating a plaintiff's evidence of pretext, "whether summary judgment is appropriate depends on a number of factors, including the strength of the plaintiff's prima facie case and 'the probative value of the proof that the employer's explanation is false.'" *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 694 (9th Cir. 2017) (quoting *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 148–49 (2000)). "[M]ere assertions that [the employer] had discriminatory motivation and intent . . . [are] inadequate, without substantial factual evidence, to raise an issue precluding summary judgment." *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983). Rather, the "plaintiff's evidence must relate to the motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link between prohibited motivation and termination." *King v. United Parcel Serv., Inc.*, 152 Cal. App. 4th 426, 433–34 (2007). Ultimately, "an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory." *Guz*, 24 Cal. 4th at 361.

## III. Discussion

### A. Sexual Harassment

"Sexual harassment falls into two major categories: hostile work environment and quid pro quo." *Brooks*, 229 F. 3d at 923. Here, each Plaintiff's sexual harassment claim is for hostile work environment.[7] "A hostile work environment claim involves a workplace atmosphere so discriminatory and abusive that it unreasonably interferes with the job performance of those harassed." *Id.* "[T]o prevail on her hostile work environment claim, [each plaintiff] must show that her 'workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her

---

[7] The elements of a hostile work environment claim are: "(1) [p]laintiff belongs to a protected group; (2) plaintiff was subject to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the harassment complained of was sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment; and (5) respondeat superior." *Jones v. Dep't of Corr. & Rehab.*, 152 Cal. App. 4th 1367, 1377 (Cal. Ct. App. 2007). OI's motion focuses primarily on the fourth element.

employment and create an abusive working environment.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (internal brackets and ellipses omitted). "[T]he required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Id.* at 926 (quoting *Ellison v. Brady*, 924 F.2d 872, 879 (9th Cir. 1991)). "Unless harassing conduct is 'severe in the extreme,' there is 'no recovery for harassment that is occasional, isolated, sporadic, or trivial.'" *Rubadeau v. M.A. Mortenson Co.*, No. 1:13-CV-339 AWI JLT, 2013 WL 3356883, at *6 (E.D. Cal. July 3, 2013) (quoting *Hughes v. Pair*, 46 Cal. 4th 1035, 1043 (2009)).

Although these principles apply equally to each Plaintiff's sexual harassment claim, their claims are based on entirely separate instances of purported harassment and will be analyzed separately.

### 1. Gonzales

Viewing the evidence in a manner most favorable to Gonzales, Ferrer made statements that Gonzales found objectionable on three occasions over the ten months that Ferrer and Gonzales both worked at OI. However, most of the behavior or comments from Ferrer about which Gonzales complained were not sexual or gender specific. That Ferrer treated Gonzales in an unprofessional manner, accused her of lying, or told her that other OI employees did not like her is not actionable under FEHA because to the extent any of this behavior was inappropriate, there is no evidence that it was sexual or discriminatory in nature or that he treated women differently from men.

Likewise, discriminatory comments Ferrer may have made to Boyd, Colombo, or other OI employees are irrelevant to Gonzales's hostile work environment claim because there is no evidence that Gonzales was present for or aware of any of those comments while she worked for OI, meaning such comments could not have altered the conditions of her employment to create an abusive working environment. Thus, the only statements of Ferrer that could support a sex discrimination claim against women are those he made to Gonzales about pregnancy and having babies, and his comment about women's backsides. It is questionable whether some of these statements could be considered to have been made on

the basis of Gonzales's sex so as to form the basis of a sexual harassment claim.  *See Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 280 (2006) ("[I]t is the disparate treatment of an employee on the basis of sex—not the mere discussion of sex or use of vulgar language—that is the essence of a sexual harassment claim.").  Further, that Ferrer called Gonzales "girl" is not sufficient to trigger sexual harassment liability.  *See id.* at 282 (noting that "comments that have the sexual charge of an Abbott and Costello movie and that could easily be repeated on primetime television are not the type that trigger Title VII liability.") (internal quotation marks and brackets omitted).

Even assuming that the comments about which Gonzales complains were all directed to her on the basis of sex, the evidence shows that Ferrer made these statements to Gonzales or in her presence on only three occasions during the ten plus months that they worked together.  No reasonable juror could find these statements to be severely discriminatory or pervasive.  *See, e.g., McCoy v. Pac. Mar. Ass'n*, 216 Cal. App. 4th 283, 294 (Cal. Ct. App. 2013) (holding that comments about other women's bodies outside of their presence, with no sexual comments directed to the plaintiff, that were made between five and nine times over the course of four months, were not so severe and pervasive as to alter the conditions of the plaintiff's employment).  Because Gonzales offers no additional evidence of a sexually hostile work environment, OI is entitled to summary judgment on this claim.[8]

---

[8] The opposition brief relies extensively on *Roby v. McKesson Corp.*, 47 Cal. 4th 686 (2009), for the proposition that improper personnel actions can be used to support a hostile work environment.  *Roby* is a highly distinguishable disability discrimination case where the Court held that some discriminatory employment actions can support a harassment claim to the extent those discriminatory actions "contributed to the hostile message that [the supervisor] was expressing to [the plaintiff] in other, more explicit ways."  *Id.* at 709.  The discriminatory employment actions that the court found could also support harassment included "shunning of [the plaintiff] during staff meetings, . . . belittling of [the plaintiff's] job, and . . . reprimands of [the plaintiff] in front of [the plaintiff] coworkers."  *Id.* at 709.  None of OI's personnel and employment decisions concerning any of the Plaintiffs fall into this category.  Moreover, even taking into consideration the various objective setting plans, PIPs, and other personnel actions taken by OI that affected the plaintiffs, such acts were neither severe nor pervasive enough to overcome summary judgment on Gonzales's (or the other Plaintiffs') sexual harassment claims.

### 2.    Boyd

Boyd's sexual harassment claim fails for the same reasons. Viewing the evidence most favorably to Boyd, Ferrer made the alleged discriminatory or harassing statements to Boyd or in her presence on only three occasions. Because conduct Boyd felt was harassing only occurred on three occasions over the course of ten months, it was not pervasive. Further, no reasonable juror would find these isolated statements to be so severe as to create an abusive working environment. Accordingly, OI is entitled to summary judgment on Boyd's sexual harassment claim.

### 3.    Colombo

As with Gonzales and Boyd, Colombo's sexual harassment claim is premised on a few isolated statements made by Ferrer. These statements were not severely discriminatory or harassing and were not pervasive. Accordingly, for the same reasons, OI is entitled to summary judgment on Colombo's sexual harassment claim as well.

### B.    Discrimination

Although the specific elements of a prima facie case of discrimination can vary, "[g]enerally, the plaintiff must provide evidence that (1) [s]he was a member of a protected class, (2) [s]he was . . . performing competently in the position [s]he held, (3) [s]he suffered an adverse employment action, such as termination, demotion . . . and (4) some other circumstance suggests discriminatory motive." *Guz*, 24 Cal. 4th at 355.

### 1.    Gonzales

There is no dispute that Gonzales, as a woman, is a member of a protected class, or that her termination was an adverse employment action. Thus, the only elements in question are whether Gonzales was performing competently and evidence of a discriminatory motive for her termination.

As for Gonzales's performance, evidence shows that she was at 85.5% of her sales quota for the year through July 2013 when she was first put on an objective setting plan by Ferrer. [Doc. No. 28-2 at 123.] On the other hand, Gonzales had exceeded her quota in July 2013, and did so again in September 2013. [Doc. No. 31-10 at 39.] There is also

18

evidence that Ferrer and Emmanuel each individually observed Gonzales engaging in activities that they believed to violate compliance rules during their ride-alongs with her on October 17, 2013 and October 31, 2013, respectively. It is these compliance violations that eventually led to Gonzales's termination. Although not entirely clear from the opposition, it appears that Gonzales does not dispute Ferrer's and Emmanuel's observations of her actions, she disputes that her actions were compliance violations. Ultimately, the Court need not determine whether Gonzales actually violated compliance rules based on the observations of Ferrer and Emmanuel in the context of evaluating whether she can demonstrate a prima facie case. Viewing the evidence most favorably to Gonzales, she has at least satisfied the third element of a prima facie case of gender discrimination.

Nevertheless, there is no evidence of a discriminatory motive—that Gonzales was terminated because she is a woman. The only evidence of any gender specific comments made by anyone at OI are the comments Gonzales heard from Ferrer. According to the evidence, however, only Austin, Bilbo, and Samaha were involved in the decision to terminate Gonzales, and there is no evidence that any of these individuals made any discriminatory comments or acted with a discriminatory motive. *Cf. Harris v. City of Santa Monica,* 56 Cal. 4th 203, 231 (2013) (noting Justice O'Connor's concurring opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989), that "neither 'stray remarks in the workplace,' 'statements by nondecisionmakers,' nor 'statements by decisionmakers unrelated to the decisional process itself' can establish, by themselves, that improper bias was in fact a motivating factor behind a particular employment decision.").

In the opposition brief, Gonzales focuses almost entirely on her retaliation claim with little argument, and no citation to evidence, demonstrating Gonzales's gender played any role in the decision made by Austin, Bilbo, and Samaha to terminate her, as is required

to establish a prima facie gender discrimination claim.[9]  Thus, viewing the evidence most favorably to Gonzales, even absent an explanation from OI, it is not more likely than not that she was terminated because of gender discrimination.  *See Guz*, 24 Cal 4th at 355. Accordingly, Gonzales has not made a prima facie claim of gender discrimination.

Even assuming Gonzales makes a prima facie case of discrimination, OI has articulated a legitimate non-discriminatory reason for terminating her.  Namely, OI states that it terminated Gonzales for compliance infractions and an inability to comply with OI's compliance program.  [Doc. No. 28-2 at 115.]  Thus, the burden shifts back to Gonzales to present evidence that OI's grounds for terminating her were a pretext for gender discrimination.  Gonzales does not satisfy this burden by offering specific evidence that would allow a jury to find pretext.

First, Gonzales points to a positive performance evaluation that she had received for 2012, almost a year before her termination.  Although prior favorable performance evaluations may be relevant to pretext when an employer's justification for termination is a more subjective and vague assertion that the plaintiff was not performing well, a positive performance evaluation for the year 2012 does not, without more, demonstrate that a termination for specific compliance violations that occurred almost a year later was pretextual.[10]

--------

[9] As discussed below, whether Plaintiff has presented sufficient evidence to demonstrate a prima facie case that the decision to terminate her was in retaliation for her complaints, thereby creating a prima facie retaliation claim, is a separate question.

[10] The cases Plaintiffs cite all concern retaliation claims as opposed to discrimination claims.  [Doc. No. 31 at 25.]  Moreover, in most of these cases, past performance is merely listed as one of many factors supporting pretext, not as sufficient evidence to survive summary judgment on its own.  In *Colarossi v. Coty US Inc.*, 97 Cal. App. 4th 1142, 1154 (Cal. Ct. App. 2002), the court found the plaintiff's past positive evaluations relevant only as additional evidence supporting what it deemed to be a "smoking gun" statement from a supervisor that she was going to get revenge on everyone who participated in a sexual harassment investigation against her, and it was "undisputed that [the plaintiff] was named the company's best merchandiser in all the country shortly before" the investigation.  In *Mendoza v. Western Medical Center Santa Ana*, 222 Cal. App. 4th 1334 (Cal. Ct. App. 2014), the employer claimed that it terminated the plaintiff based on the belief that he was complicit in the sexual misconduct of which he complained. In *George v. California Unemployment Insurance Appeals Board*, 179 Cal. App. 4th 1475 (Cal. Ct. App.

Second, Gonzales argues that OI's failure to seek out evidence that she had not engaged in any compliance violations demonstrates pretext. Notably, in making this argument, Gonzales offers no citations to any exculpatory evidence that OI did not consider. [Doc. No. 31 at 31-32.] Moreover, Gonzales's dissatisfaction with OI's investigation of her infractions is belied by the facts. OI did not terminate Gonzales immediately based solely on Ferrer's report of compliance violations during the October 17, 2013, ride-along and without hearing Gonzales's side of the story or contrary evidence. Instead, following Ferrer's initial report of violations, Emmanuel, a member of OI's compliance department who was not involved in Gonzales's complaint against Ferrer, went on a ride-along where he also observed compliance violations first-hand. OI then sent Gonzales a warning letter requiring her to complete remedial compliance training, and held a teleconference with Gonzales to discuss Emmanuel's observations that were detailed in the letter. [Doc. No. 28-2 at 31-46, 418-23.] Indeed, Gonzales was given the opportunity to present her side of the story, and there is no evidence that Gonzales would have been terminated if she had simply acknowledged Emmanuel's first-hand observations instead of disputing his veracity or the existence of any compliance violations. [Doc. No. 28-2 at 423.] Ultimately, the evidence in the record reflects that based on Emmanuel's first hand observations of Gonzales's actions and Gonzales's response to the warning letter, none of which are disputed, OI decided to terminate Gonzales.[11] Gonzales may disagree with the

2009), the decision maker told the plaintiff she would be "sorry" if she made her complaints, and the plaintiffs work history was listed as just one of numerous other factors from which inferences of retaliatory intent could be drawn. In *Flait v. North American Watch Corp.*, 3 Cal. App. 4th 467 (Cal. Ct. App. 1992), the employer's justification for his termination was directly contradicted by objective measures of his past performance and compliments he had been given before the protected activity.

[11] All of the cases on which Plaintiffs rely involved the termination of the plaintiff based on violations that were observed or investigated only by another employee who had been the subject of a previous complaint by the plaintiff. *See, e.g., Mendoza*, 222 Cal, App. 4th at 1344 (defendant terminated employee who complained he was harassed by his supervisor based solely on supervisor's claim that employee was the instigator and willing participant in the improper activity); *Nazir v. United Airlines, Inc.,* 178 Cal. App. 4th 243, 277, (Cal. Ct. App. 2009) (noting that the defendant's investigation of the plaintiff's alleged harassment of a contractor was led by "a person who at least inferentially had an axe to grind, assisted by someone who "served" him. Such an investigation can itself be evidence of pretext."); *Reeves v. Safeway*

15cv1530-CAB-NLS

result, but there is no evidence supporting her arguments that OI did not adequately investigate her violations.

Third, Gonzales argues that OI's non-discriminatory reasons for her termination are pretextual because they were based on subjective criticisms of her performance. Although Gonzales's statement of the law may be accurate, it does not help her here because OI's reasons for terminating her—compliance violations observed by OI first-hand and Gonzales's refusal to acknowledge those violations—are not subjective criticisms of her performance.

Accordingly, even if Gonzales has made a prima facie case of gender discrimination, her claim fails because she has not identified any specific evidence demonstrating that OI's legitimate non-discriminatory justification for terminating her was pretextual.

### 2. Boyd[12] and Colombo

OI laid off both Boyd and Colombo as part of a larger reduction in force. Ferrer, the only individual who made any discriminatory statements to either Boyd or Colombo, was not involved in the decision to include them in the layoff and was not even aware of it until he learned that Boyd and Colombo were going to be laid off. There is no evidence of a discriminatory motive by the OI management who made the decisions to include Boyd in Colombo in the layoff. Nor is there any evidence that males were treated more favorably in connection with the layoff. Indeed, a male TRS in the same region was also laid off at the same time, while a female TRS was not laid off, and the record is otherwise silent as to the composition of the remainder of the OI workforce that was laid off. Accordingly, neither Boyd nor Colombo establishes a prima facie case of discrimination based on their termination.

---

*Stores, Inc.*, 121 Cal. App. 4th 95 (Cal. Ct. App. 2004) (plaintiff was terminated based primarily on investigation and report of an incident with another employee by supervisor who had been subject of complaints by the plaintiff).

[12] The complaint alleges that OI discriminated against Boyd based on her age as well as her sex, but the opposition completely ignores this claim so the Court deems it waived.

Even assuming Boyd or Colombo do establish a prima facie case of discrimination, OI has asserted a legitimate nondiscriminatory reason for the layoff as a whole (the adverse Medicare reimbursement decision) and for laying off Boyd and Colombo in particular based on sales data. Plaintiffs do not offer any evidence demonstrating that OI's reasons are a pretext for discrimination. Plaintiffs argue that the sales data used was misleading because it showed sales for some of the newly hired male TRSs in the southwest region that was attributable to the TRSs who worked in the territory before the male TRSs were hired, but do not provide any evidence that the error was intentional or that OI management who were making the layoff decisions were aware of the error (assuming there was such an error). Nor is there any evidence that any alleged errors in the data were made intentionally to negatively impact women TRSs or Boyd and Colombo in particular to justify their layoff. Accordingly, because Boyd and Colombo do not present any substantial and specific evidence that OI's reasons for laying them off were a pretext for gender discrimination, they have also failed to carry their burden in the third stage of the *McDonnell Douglas* framework. *See generally Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 663 (9th Cir. 2002) (affirming summary judgment on discrimination claim based where the defendant had laid the plaintiff off because the plaintiff had not put forth specific and substantial evidence that the defendant's reasons for his layoff were a pretext for racial discrimination).

### C.    Retaliation

"FEHA makes it unlawful for an employer 'to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part.'" *Lawler*, 704 F.3d at 1243 (quoting Cal. Gov't Code § 12940(h)). "[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the

23

protected activity and the employer's action." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005); *see also Brooks*, 229 F.3d at 928.

### 1. Gonzales

Gonzales's inability to make a prima facie case of gender discrimination or sexual harassment is not fatal to her retaliation claim. "It is well established that a retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory, even when a court later determines the conduct was not actually prohibited by the FEHA." *Yanowitz*, 36 Cal. 4th at 1043. Here, OI does not argue that Gonzales has not established a prima facie case of retaliation. Indeed, she engaged in protected activity with her complaint about Ferrer, and the investigation into her performance that resulted in her termination commenced within months of her complaint. The temporal proximity of her termination to her complaint is sufficient to establish a prima facie case of retaliation. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) ("[I]n some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.").

As discussed above in connection with her discrimination claim, there is no dispute that OI has satisfied its burden to offer a legitimate non-discriminatory reason for terminating Gonzales. Thus, as with the discrimination claim, the burden shifts back to Gonzales to demonstrate that OI's reason (the compliance violations and other grounds stated in the termination letter) is pretextual and that Gonzales was actually terminated in retaliation for her complaint about Ferrer.

"In some cases, temporal proximity can by itself constitute sufficient circumstantial evidence of retaliation for purposes of both the prima facie case and the showing of pretext." *Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir. 2011) (holding that two days between the protected activity and summary judgment was enough to overcome summary

judgment).[13]  This is not one of those cases.  Four months passed between when Gonzales made her complaint and when she was terminated, and OI's reasons for terminating her were based entirely on specific events that occurred months after Gonzales's complaint about Ferrer.  Moreover, as discussed above in connection with her discrimination claim, Gonzales does not present any evidence, aside from temporal proximity, that would support a finding that the individuals who made the decision to terminate her were using the compliance infractions as a pretext to retaliate against her for complaining about Ferrer. Accordingly, although Gonzales has established a prima facie case, OI is entitled to summary judgment on Gonzales's retaliation claim.

## 2. Boyd and Colombo

It is less obvious that either Boyd or Colombo engaged in a protected activity because neither of them made a formal complaint to OI about Ferrer.  Boyd mentioned two of the comments she claims were discriminatory when Howard called her as part of the investigation of Gonzales's complaint, and Colombo mentioned Ferrer's conduct when she called Howard to discuss her PIP.  Assuming these statements constitute assisting in OI's investigation, they are protected activity.  *Lawler*, 704 F.3d at 1243.  Nevertheless, because there is no evidence that any of the individuals responsible for the decision to lay them off were aware of this protected activity, Boyd and Colombo fail to establish a causal link between their protected activity and their termination.  OI could not have terminated Boyd and Colombo because of their statements to Howard about Ferrer if the individuals who made the decision to terminate Boyd and Colombo were unaware of such statements.  *See*

---

[13] *But see Raphael v. Tesoro Corp.*, No. 215CV05080SVWJEM, 2016 WL 6634915, at *11 (C.D. Cal. Oct. 26, 2016) ("Whereas timing alone may establish a prima facie case, the 'mere coincidence of timing' is not sufficient to demonstrate retaliatory motive or show pretext.") (citing *Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1188 (C.D. Cal. 2013)); *Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1112 (Cal. Ct. App. 2007) ("[T]emporal proximity, although sufficient to shift the burden to the employer to articulate a nondiscriminatory reason for the adverse employment action, does not, without more, suffice also to satisfy the secondary burden borne by the employee to show a triable issue of fact on whether the employer's articulated reason was untrue and pretextual.").

*generally Colarossi v. Coty US Inc.,* 97 Cal. App. 4th 1142, 1152 (2002) (noting that to demonstrate a causal link between participation in sexual harassment investigation and subsequent termination, there must be evidence that a person involved in the termination decision knew of the plaintiff's participation).

Separately, although it is hardly clear from the opposition brief, Boyd appears to contend that two accounts were taken away from her and she was placed on a PIP in retaliation for her statements to Howard about Ferrer. Although these are at least arguably adverse employment actions, there is no evidence that Ferrer or anyone else responsible for these employment actions was even aware that Boyd had spoken with Howard about Ferrer, meaning Boyd has not presented any evidence that would establish a causal link between her protected activity and these adverse actions. Accordingly, Boyd cannot survive summary judgment on her retaliation claim based on these employment actions either.

For her part, Colombo appears to contend that Ferrer retaliated against her insofar as he "began to contact her less frequently, and . . . acted condescendingly" after Colombo spoke with Howard about him. [Doc. No. 31 at 14.] These vague descriptions of Ferrer's behavior "cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment for purposes of section 12940(a) (or give rise to a claim under section 12940(h))." *Yanowitz*, 36 Cal. 4th at 1052, 1054 (stating that "an adverse employment action must materially affect the terms and conditions, or privileges of employment to be actionable" in the FEHA context). Accordingly, to the extent Colombo's retaliation claim is premised on a change in Ferrer's demeanor after Colombo spoke with Howard, it also does not survive summary judgment. *See generally Reynaga*, 847 F.3d at 693 ("Only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation.") (quoting *Brooks*, 229 F.3d at 928)).

Finally, even if Boyd and Colombo do establish a prima facie case of retaliation, their failure to demonstrate pretext as discussed above in connection with their

discrimination claims is equally applicable to this claim. Accordingly, OI is entitled to summary judgment on Boyd and Colombo's retaliation claims.

### D. Failure to Prevent Discrimination

"Under California law, there can be no claim for failure to prevent discrimination when no actionable discrimination occurred." *McKenzie v. San Joaquin Valley Coll., Inc.*, No. EDCV1600769JGBDTBX, 2017 WL 2129685, at *12 (C.D. Cal. May 15, 2017) (citing *Trujillo v. N. County Transit Dist.*, 63 Cal. App. 4th 280, 289 (Cal. Ct. App. 1998)). Moreover, the opposition brief never mentions this claim. Accordingly, because OI is entitled to summary judgment on all three Plaintiffs' sexual harassment, discrimination, and retaliation claims, and because the Court deems Plaintiffs' failure to oppose summary judgment on these claims as abandonment of the claims, OI is entitled to summary judgment on Plaintiffs' failure to prevent discrimination claims as well.

### E. Wrongful Termination in Violation of Public Policy

The remaining claim is for wrongful termination in violation of public policy. "The elements of a claim for wrongful discharge in violation of public policy are (1) an employer-employee relationship, (2) the employer terminated the plaintiff's employment, (3) the termination was substantially motivated by a violation of public policy, and (4) the discharge caused the plaintiff harm." *Espinoza v. W. Coast Tomato Growers, LLC*, No. 14-CV-2984 W (KSC), 2016 WL 4468175, at *2 (S.D. Cal. Aug. 24, 2016) (quoting *Yau v. Santa Margarita Ford, Inc.*, 229 Cal. App. 4th 144, 154 (2014)). The opposition never mentions this claim, let alone identifies any public policy violations that motivated her termination. It is not for the Court to make these arguments for Plaintiffs. Moreover, to the extent Plaintiffs intend to premise their wrongful termination claims on the same behavior underlying their discrimination and retaliation claims, these claims fail for the

same reasons.  Accordingly, OI is entitled to summary judgment on each Plaintiffs' wrongful termination claim as well.[14]

## IV.    Conclusion

For the foregoing reasons, OI's motion for summary judgment is **GRANTED**.

It is **SO ORDERED**.

Dated:  June 5, 2017

_____
Hon. Cathy Ann Bencivengo
United States District Judge

---

[14] OI also moves for summary judgment on Plaintiffs' prayers for punitive damages.  Because none of Plaintiffs' claims survives summary judgment, this aspect of the motion is moot.